Complainant prays discovery and accounting and alleges that through his efforts the defendant, Button Corporation of America, sold plastic buttons to the United States government for use on the uniforms of the members of the armed forces. Complainant bases his right to recovery on the terms embodied in the following letter: *Page 358 
"September 11, 1940. Mr. Al Davidson 40 North Street New York City
Dear Sir:
This letter confirms our understanding of this date, whereby we engage your services for a period of three years from date, to endeavor to help us secure business on plastic insignia buttons from the United States Government and its various agencies
We will credit your account with all business, original and duplicates, placed with us or our subsidiaries, on these items by the United States Government and its agencies.
We agree that the compensation to you for this merchandise delivered by us to the United States Government will be on a commission basis, equivalent to 12 1/2% on the net amount of the selling price and copies of our invoices and bills will be delivered to you as and when shipments are made by us to the government.
Commissions statements will be rendered and payments made to you on or about the 10th of each month following the date of our shipments.
Yours very truly, BUTTON CORPORATION OF AMERICA P. Ch Christensen Al Davidson President Alfred Davidson __________________ Accepted Al Davidson."
Why this agreement was made with Davidson, who is not a broker, a plastic expert nor a salesman, but a dealer in small wares finds explanation in what follows here.
Sometime in 1940, Davidson says, "I conceived an idea, having had a little experience during the last war in which I had interested the government in the last war in a button." Believing that this country would be drawn into the war, he says he went to Washington and also to the Quartermasters Department in Philadelphia. He saw the captain in charge of the Bureau of Standards. In the month of June, July or August, 1940, he visited Mr. Christensen, president of the defendant company. The letter forming the contract between the parties then followed.
Plastic buttons, according to the established facts in this case, were in use as far back as 1934, perhaps not of the same kind involved in this case. The idea was, however, not new. The testimony leaves no doubt that complainant, who had *Page 359 
some experience with the sale of buttons in the last war, was to be the contact man on a commission basis. When first he called to see Mr. Christensen early in 1940 at his office he told him "he had contacts and thought that he could get a negotiated contract." Whether he had any assurance then because of his previous trip to Washington or not that he would be successful does not appear. However, according to the letter herein set out, it was then agreed that he was to put forth his endeavors for three years "to help us [Button Corporation of America] secure business on plastic insignia buttons from the United States government and its various agencies." His compensation was to be "equivalent to 12 1/2% on the net amount of the selling price." Dissatisfied with payments made to him, Davidson demanded an accounting and on the hearing he was shown a paper dated March 15th, 1943, labeled "Total government shipments through February 28th, 1943," which he says is a copy that was given to him by Mr. Christensen of the defendant corporation. He had received on account some $7,200, and the amount he figured due him according to the statement of February 28th, 1943, is "some thirty-five or thirty-six thousand dollars."
The first two or three contracts entered into with the government were negotiated contracts. Thereafter, contracts for buttons were made on open bids. It was then that Christensen told Davidson that he would not bid if his company had to pay commission on open bids, whereupon they talked of revising his commissions downward.
The rule was early established that contracts for contingent compensation for services in selling supplies to the United States are void. Providence Tool Co. v. Norris, 2 Wall. (69U.S.) 45; 17 L.Ed. 868, decided in 1865. In that case the Tool Company entered into contract with the government to deliver muskets within stated periods of a specified pattern, at the rate of $20 a musket. The contract was procured through Norris upon a previous agreement with the corporation that in case he obtained a contract of the kind, he should receive compensation for his services proportionate to the extent of the contract. The general principle was there laid down that: *Page 360 
"All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the government. No other consideration can lawfully enter into the transaction, so far as the government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds.
"We have not met with any adjudication upon an agreement precisely similar, but the principle which determines its invalidity has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation for procuring legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. * * * Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. * * *
"Other agreements of an analogous character might be mentioned, which the courts, for the same or similar reasons, refuse to uphold. * * * The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country."
Other cases laying down the same principle are Oscanyan v.Winchester Repeating Arms Co., 103 U.S. 261; 26 L.Ed. 539;Hazelton v. Sheckels, 202 U.S. 71; 50 L.Ed. 939.
Complainant's solicitors have cited cases in other jurisdictions which they claim show a tendency to relax the rule *Page 361 
enunciated in Providence Tool Co. v. Norris, supra. But the courts in this state adhere to the principle that the decision of whether the contract in a case such as the one before the court violates public policy, does not turn upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of such agreements.
The principle laid down in Providence Tool Co. v. Norris,supra, was adopted by our Court of Errors and Appeals inBrooks v. Cooper, 50 N.J. Eq. 761; 27 Atl. Rep. 978, where in the opinion by Mr. Justice Lippincott, he said:
"* * * All agreements, for financial consideration, to control or influence the business operations of the government, * * * are void as against public policy, without reference to the question whether improper measures are contemplated or used in their execution. * * * Tool Co. v. Norris, 2 Wall. (U.S.) 45."
Mr. Justice Lloyd in Weehawken Realty Co. v. Hass, 13 N.J.Mis. R. 231, which was an appeal from the judgment of nonsuit entered in the District Court of Hudson County in a suit upon a contingent contract for services rendered in securing a tax assessment reduction, held the contract void, and based his holding "not alone on necessary wrong in the contract, but on the tendency to corrupt. A contingent fee is a temptation to the use of all available means to success, and this both legitimate and otherwise. * * * See Noonan v. Gilbert, 28 Fed. Rep. (2ded.) 775. * * *"
Vice-Chancellor Backes in Wright v. Fissell, 92 N.J. Eq. 508; 113 Atl. Rep. 699, struck down a contract of a building contractor who agreed to pay complainant one-half of the profits on contracts procured for him with the United States government, citing among others the cases of Providence Tool Co. v.Norris, supra, and Oscanyan v. Winchester Repeating ArmsCo., supra.
A similar contract in Stone v. William Steinen ManufacturingCo., 22 N.J. Mis. R. 353, was held void as against public policy. Affirmed, 133 N.J. Law 16.
The facts in this case leave no doubt that Davidson was employed by the defendant because it was believed that he had certain contacts and hence the agreement to pay a commission, *Page 362 
which to me seems out of all proportion to the service he was called upon to render. While there is no proof in this case of sinister or corrupt means employed in procuring the contracts made with the government, the agreement between the parties is one which has a tendency to the use of corrupt means. The decision of this matter therefore does not turn upon the question of whether improper influence was used but rather upon the corrupting tendency of the agreement.
The agreement is void as against public policy. Bill dismissed.