**UNITED STATES v. PADDOCK.**

No. 12738.

United States Court of Appeals
Fifth Circuit.

Dec. 9, 1949.

A. W. Christian, Asst. U. S. Atty., Fort Worth, Texas, O. Morris Harrell, Asst. U. S. Atty., Fort Worth, Texas, Frank B. Potter, U. S. Atty., Fort Worth, Texas, for appellant.

Richard U. Simon, Fort Worth, Texas, Frank B. Appleman, Fort Worth, Texas, for appellee.

Before HOLMES, McCORD and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a judgment of the court below that confirmed, on petition for review, an order of the referee in bankruptcy, which disallowed two claims of the United States, as follows: (a) One for the recovery of $383,527.47, hereinafter referred to as the contingent-fee claim, being the amount paid by the bankrupt, Globe Aircraft Corporation, to Production Engineering Co., Inc., as commissions for the procurement of government contracts during World War II; (b) the other for $200,000, being the amount of excessive profits, alleged to have been realized by Globe Aircraft Corporation on war contracts during the year 1945, hereinafter referred to as the renegotiation claim. Of these two claims in the order above mentioned:

■ (a) We agree with appellant that the payment of the contingent commissions by the Globe Aircraft Corporation to Production Engineering Company, Inc., constituted a breach of the warranty embodied in each of the contracts between the Government and said corporation. This warranty was required by Executive Order No. 9001, 50 U.S.C.A.Appendix, § 611 note; it was promulgated by the President of the United States on December 27, 1941, pursuant to the powers conferred on him by the Constitution and laws of the United States. Said order is as follows:

"Every contract entered into pursuant to this order shall contain a warranty by the contractor in substantially the following terms:

"The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business."

All of the bankrupt's contracts and subcontracts with the Government contained said warranty, which, it will be noted, contains an exception providing that it shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. The trustee in bankruptcy contends that Production Engineering Company comes within this exception, and the Government contends that it does not. The required specifications are that Production Engineering Company must be bona fide, must be established, must be a commercial or selling agency, and must be maintained by the contractor for the purpose of securing business. The evidence shows that said Engineering Company maintained its own office and paid all its expenses in connection with the maintenance thereof. The only substantial compensation received by it in connection with its contract with Globe was the contingent fees received from Globe for the procurement of contracts and subcontracts with the United States. One does not come within the exception to the warranty who merely receives a contribution to the support of its agency in the form of a contingent fee.

The primary decision on this item turns upon the meaning of the word maintained; for present purposes, it is the key word in the exception. If the word is given its usual and ordinary acceptation, and interpreted in the spirit of the order, the exceptive class of procurement agencies is limited to those maintained by the contractor in good faith for the purpose of securing business. To maintain here (according to the dictionary) means to keep in a particular state or condition; to sustain;

to keep possession of; to hold and defend; not to surrender or relinquish; to bear the expense of; to support; to keep up; to supply with what is needed. Consequently, a procurement agency, employed merely on contingent fees to secure war contracts, did not meet the test prescribed by the exceptive clause in what was known in army circles as the standard warranty against contingent fees.

The Production Engineering Company was not such an established agency. It was organized in 1939, and started representative work in 1940; it is said to have been initially established for the purpose of procuring government contracts.[1] Whether this is true or not, no substantial amount of the sums paid it by Globe Aircraft Corporation was for services other than that of procuring contracts with the Government on contingent fees. Consequently, it was not a bona fide selling agency maintained by the contractor for the purpose of securing business. The right of action here asserted against the bankrupt was not created by Executive Order No. 9001, and is not predicated upon a violation thereof. That order was not violated. This claim is wholly contractual; it arose from a breach of the warranty contained in the contracts signed by the United States and Globe Aircraft Corporation. When any such contract was breached, the right arose to liquidated damages in the amount of the contingent fee named in the agreement between the contractor and the person employed to secure the government contract. Two permissive self-help remedies were also given, but judicial remedies were not excluded. One seeking redress for breach of a valid contract will not be denied access to the courts except where the contracting parties have clearly evinced their intention to do so. The general rule is: Ubi jus, ibi remedium; and this means a remedy in the courts.

A provision of the warranty gives the Government the right to annul the contract or, in its discretion, to deduct from the contract price the amount of such commission, brokerage, or contingent fee. The appellee contends that this provision creates exclusive remedies; but it does not do so by express language, nor, we think, by necessary implication. It is a generally recognized principle of law that remedies provided in a contract for breach of warranty are permissive only, and not exclusive unless so provided in the contract either expressly or by necessary implication: See 55 Corpus Juris, pages 810, 811, and 37 Tex.Jur., p. 511. The Government in this claim is merely asserting its right under the covenant to deduct from the consideration the amount of the contingent fees wrongfully paid in violation of the covenant; it is not asserting a penalty claim within the meaning of Section 57, sub. j of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. j. This clause of the warranty merely provides a method of computing the liquidated damages to the Government resulting from the breach.

Executive Order No. 9001 was a declaration of public policy, and its purpose was to preserve the contractual integrity of the United States. Bradley v. American Radiator & Standard Sanitary Corp., 2 Cir., 159 F.2d 39, 41. Before the issuance of that order, a contract procured by the methods therein condemned could not be enforced by the agent against the contractor. Providence Tool Co. v. Norris, 69 U.S. 45, 17 L.Ed. 868, 870; Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L.Ed. 539; Hazelton v. Sheckles, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939, 6 Ann.Cas. 217; Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533.

Turning to the question of voluntary payments, see United States v. City of Philadelphia, 171, 50 F.Supp. 170, wherein the court said: "It has also been repeatedly held that the defense of voluntary payment is not good as against the United States." See also United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 638, 82 L.Ed. 932, wherein the court said: "The Government by appropriate action can recover funds which its agents have wrong-

1. Record, Vol. 1, p. 38.

fully, erroneously, or illegally paid. 'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute,' United States v. Bank of Metropolis, 15 Pet. 377, 401, 10 L.Ed. 774. Section 610 of the 1928 Act [26 U.S.C.A. § 3746], relied upon as barring recovery of this erroneous and unwarranted tax refund, does not grant the Government a new right, but is a limitation of the Government's long-established right to sue for money wrongfully or erroneously paid from the public treasury. Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time. * * The Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has 'clearly manifested its intention' to raise a statutory barrier."

In Heidt v. United States, 5 Cir., 56 F. 2d 559, 560, certiorari denied, 287 U.S. 601, 53 S.Ct. 8, 77 L.Ed. 523, the Government recovered judgment for overpayments made to an active officer of the Army. This court said: "One contention is that by long continuance of the payments with knowledge of the facts the United States is estopped to recover. A voluntary payment made by an individual under no mistake of fact is ordinarily not recoverable, because he may do what he wills with his own money. But the rule is quite otherwise in payments of public money made by public officers. Norfolk County v. Cook, 211 Mass. 390, 97 N.E. 778, Ann.Cas.1913B, 650 and note. They have no right of disposal of the money, but must act according to law, the law operating as a limitation on their authority to pay. The party receiving an illegal payment is bound to know the law, and ex equo et bono is liable to refund it. Wisconsin Central R. Co. v. United States, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399; United States v. Burchard, 125 U.S. 176, 8 S.Ct. 832, 31 L.Ed. 662. The long continuance of overpayments illegally made does not prevent their recovery, even when contractual relations are involved. Grand Trunk Western Ry. Co. v. United States,

252 U.S. 112, 40 S.Ct. 309, 64 L.Ed. 484. Much less where, as here, no contract has been made on the faith of them, for a soldier's services and pay are regulated wholly by law. While there is hardship in recalling money which has probably been spent, there is no basis for an estoppel because of a change of condition on the faith of the conduct or representations of another. * * * He can claim no estoppel against a demand for their repayment. * * * It follows that Heidt's inclusion of the period of his inactivity in the computation was erroneous, and the judgment for restoration of the excess paid him on that account was correct."

In Grand Trunk Western Railway Company v. United States, 252 U.S. 112, 40 S.Ct. 309, 312, 64 L.Ed. 484, in an opinion by Mr. Justice Brandeis, the court said: "It matters not how long a time elapsed before the error in making the overpayment was discovered or how long the attempt to recover it was deferred. The statute of limitations does not ordinarily run against the United States and would not present a bar to a suit for the amount. See United States v. Thompson, 98 U.S. 486, 25 L.Ed. 194. It is true that when a department charged with the execution of a statute gives it a construction and acts upon that construction uniformly for a series of years, the court will look with disfavor upon a change whereby parties who have contracted with the government upon the faith of that construction would be injured. United States v. Alabama G. S. R. Co., 142 U.S. 615, 12 S.Ct.R. 306, 35 L.Ed. 1134. But here the practice long continued of paying the full rate instead of eighty per cent. thereof was not due to any construction of a statute which the department later sought to abandon, but to what is alleged to be a mistake of fact —due perhaps to an oversight. To such a case the rule of long-continued construction has no application. The appellant must be held to have taken the road with notice of the burdens legally imposed upon it."

In Wisconsin Central Railroad Company v. United States, 164 U.S. 190, 17 S.Ct. 45, 49, 41 L.Ed. 399, the court said:

"The postmaster general, in directing payment of compensation for mail transportation, under the statutes providing the rate and basis thereof, does not act judicially; and whatever the conclusiveness of executive acts, so far as executive departments are concerned, as a rule of administration, it has long been settled that the action of executive officers in matters of account and payment cannot be regarded as a conclusive determination, when brought in question in a court of justice. * * *

"As a general rule, and on grounds of public policy, the government cannot be bound by the action of its officers, who must be held to the performance of their duties within the strict limits of their legal authority, where, by misconstruction of the law under which they have assumed to act, unauthorized payments are made. * * * The question is not presented as between the government and its officer, or between the officer and the recipient of such payments, but as between the government and the recipient, and is then a question whether the latter can be allowed to retain the fruits of action not authorized by law, resulting from an erroneous conclusion by the agent of the government as to the legal effect of the particular statutory law under or in reference to which he is proceeding."

Steele v. United States, 113 U.S. 128, 5 S.Ct. 396, 398, 28 L.Ed. 952, was a case in which the Navy Department, in contracting with the claimant for certain work upon vessels, delivered to him certain old materials at the agreed price of $2,000, which was considerably less than the true value. In his suit for payment on the contract, it was contended that the delivery of these materials to him at an agreed price was without warrant of law, and that the materials, having been disposed of, should be accounted for by the claimant at their true value. This contention was sustained, and the court said: "The fact that the account of the appellant was settled by the officers of the navy department by charging him with the value of the old material at $2,000 is no bar to

the recovery of its real value by the government. The whole transaction was illegal, and appellant is chargeable with knowledge of the fact."

In Duval v. United States, 25 Ct.Cl. 46, the court said: "Reference was made to Barnes v. District of Columbia, 22 Ct.Cl. 366, 394, wherein it was ruled, Richardson, Chief Justice, delivering the opinion, that 'the doctrine that money paid can be recovered back when paid in mistake of fact and not of law does not have so general application to public officers using the funds of the people as to individuals dealing with their own money where nobody but themselves suffer for their ignorance, carelessness, or indiscretion, because in the former case the elements of agency and the authority and duty of officers, and their obligations to the public, of which all persons dealing with them are bound to take notice, are always involved.' We concur in these views, and are of the opinion that there is nothing on this record to take the case out of the scope of the principle that parties receiving moneys illegally paid by a public officer are liable ex equo et bono to refund them."

The above principles are not applicable solely to the federal government, but have been applied in cases where cities, counties, and states were involved.

In City of Taylor v. Hodges, 143 Tex. 441, 186 S.W.2d 61, 63, the Supreme Court of Texas said: "The rule invoked that relief cannot be had from a payment made under a mistake of law is recognized as being generally applicable in private transactions, but when the payment is made with public money, we think the sounder and more equitable rule is that relief may be had therefrom. The City of Taylor did not pay this money through mistake of law. It made no mistake. Its clerk and the Chairman of its Board of Commissioners made a mistake, but they are not the agents of the City in the sense that their mistakes of law are its mistakes. Public officers deal with money belonging to the public, and the application of a rule under which such officials could

pay out public funds for an unauthorized purpose and the municipality would be denied a recovery therefor merely because such public officers made a mistake of law could hardly be justified. The County owed the money; the City discharged that obligation and we perceive no reason why it should not be reimbursed therefor. Lamar Township v. [City of] Lamar, 261 Mo. 171, 169 S.W. 12, Ann.Cas.1916D, 740; Aebli v. Board of Education of City and County of San Francisco, 62 Cal.App.2d 706, 145 P.2d 601; State v. Weatherby, 344 Mo. 848, 129 S.W.2d 887; United States v. Bentley, 2 Cir., 107 F.2d 382; United States v. City of Philadelphia, D. C., 50 F.Supp. 170; School District No. 49 in Logan County v. Community High School, 126 Kan. 51, 267 P. 23; City of Bismarck v. Burleigh County, 49 N.D. 205, 190 N.W. 811."

(b) This portion of the Government's claim, filed with the referee in bankruptcy, was for excessive profits realized by the bankrupt under government contracts and subcontracts for the fiscal year ending December 31, 1945, in the amount of $200,-000, less any applicable credit, plus interest to date of payment. This claim arose under the Renegotiation Act, which is set forth in Title 50, U.S.C.A.Appendix, § 1191. The act provided for the creation of a War Contracts Price Adjustment Board, to which was delegated the authority to determine whether or not amounts accrued or received under contracts with the Government were excessive. Such renegotiation proceedings were instituted in this case, and this claim is predicated upon the determination by said board of the amount of the bankrupt's liability for excessive profits. These renegotiation proceedings were filed prior to the filing of the reorganization petition in bankruptcy, and were pending at that time. The trustee in bankruptcy and the contractor had notice of the renegotiation proceedings.

In the court's order approving the petition in bankruptcy, the trustee was granted ample authority to defend any suit, action, claim, or proceeding, pending against the debtor in any court or before any commission, department, or tribunal, and all appeals therefrom.

Under said order, the trustee could have participated in the renegotiation proceedings and taken such steps as he deemed necessary to protect the interest of the bankrupt estate, and could have taken an appeal from the order of the board to the Tax Court of the United States, but he failed to do so; and there was no order of the bankruptcy court that specially stayed the renegotiation proceedings. The jurisdiction of the bankruptcy court is now being invoked by the Government in this case, in that it has presented for allowance and classification its claim for excessive profits which has been established by the tribunal that had the exclusive authority to do so. Having failed to make any appearance in such proceedings, and having failed to take an appeal from the board's order, the trustee in bankruptcy is precluded under the terms of the renegotiation act from asserting any defense to said claim. Title 50 U.S.C.A.Appendix, § 1191(c) (1) and (2) and (d) (1), In re Barret & Co., D.C., 27 F.2d 159, 161; In re Murel Holding Corporation, 2 Cir., 75 F.2d 941, 942; In re Island Park Associates, Inc., 2 Cir., 77 F.2d 334, 337; Red River National Bank v. Bray, Tex.Civ. App., 132 S.W. 968, 971, reversed on another point, 105 Tex. 312, 148 S.W. 290; 8 C.J.S., Bankruptcy, §§ 28, 491, pages 441-442 and 1366, 1368, 1370. Cf. Yakus v. United States, 321 U.S. 414, 443, 64 S.Ct. 660, 88 L.Ed. 834.

The judgment appealed from is reversed, and judgment entered here for appellant.

Reversed and rendered.