INTER–CONTINENTAL PROMOTIONS, INC., Plaintiff-Appellee,

v.

The MIAMI BEACH FIRST NATIONAL BANK and Fred R. Baisden, as Executors of the Last Will and Testament of William B. MacDonald, Jr., deceased, etc., Defendants-Appellants.

No. 29404.

United States Court of Appeals, Fifth Circuit.

April 9, 1971.

Rehearing Denied and Rehearing En Banc Denied May 19, 1971.

Irving B. Levenson, Marion E. Sibley, Sibley, Giblin, Levenson & Ward, Miami Beach, Fla., for defendants-appellants.

Hansford D. Tyler, Jr., David D. Phillips, Mallory Horton, Horton & Schwartz, Miami, Fla., for plaintiff-appellee.

Before GEWIN, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This Florida diversity matter is before us a second time. On the first occasion we reversed the District Judge, who granted defendants' motion to dismiss for failure to state a claim, and remanded the case for trial on the merits. See Inter-Continental Promotions, Inc. v. MacDonald, 5 Cir., 1966, 367 F.2d 293. Accordingly, a trial was held with a full development of the facts and circumstances of the case. This time the District Court (sitting without a jury) rendered judgment in favor of plaintiff.

This breach of contract action by Inter-Continental Promotions, Inc. against William B. MacDonald, Jr.[1] grows out of the world heavyweight championship fight between Charles "Sonny" Liston and Cassius Clay on February 25, 1964. Inter-Continental and MacDonald entered into a contract by which Inter-Continental agreed to produce Liston and Clay at the specified time and place

---

1. The complaint was originally brought against William B. MacDonald, Jr. and his surety, New Amsterdam Casualty Company. Upon the death of MacDonald, appellants, The Miami Beach First National Bank and Fred R. Baisden, as Executors of the Last Will and Testament of William B. MacDonald, Jr., were substituted in the place and stead of MacDonald and New Amsterdam Casualty Company.

in Miami Beach, Florida, where they would engage in the boxing contest.[2] In consideration of the payment of $625,000, payable upon the completion of the boxing contest, MacDonald was to receive the live gate proceeds. However, all ancillary rights, such as television, radio and movie rights, were retained by Inter-Continental. Under the contract MacDonald had "the right and obligation to promote said boxing contest in the manner he deems fit; to print and sell admission tickets thereto; to collect the proceeds of ticket sales; to arrange all seatings; to make whatever arrangements he deems necessary for the press; to pay all local, state, and federal taxes on admissions; to arrange and pay for the undercard preliminary fights; to pay all fees and expenses of the controlling boxing commission; to advertise and promote said live gate; to make press releases; and, to do any and all things of that kind and nature reasonably necessary for the enhancement of said live gate." Arrangements were duly made and on February 25, 1964, Clay knocked out Liston and won the heavyweight championship of the world.

The gate receipts of only $225,000, however, fell far short of MacDonald's expectations and the consideration he had agreed to pay for those rights. He turned over the gate receipts to Inter-Continental which then brought this suit for the balance.

Florida has declared a public policy forbidding the performance of prize fighting and pugilistic exhibitions for reward. This prohibition is contained in Florida Statutes Annotated § 548.01, a statute providing criminal penalties of a fine of not less than $2,500 nor more than $5,000, or imprisonment for not more than 5 years.[3] Section 548.03, however, excepts from the prohibition boxing exhibitions which are "held by and under the auspices of" certain named civic, educational and charitable organizations, including the Veterans of Foreign Wars, and further provides that "nothing contained herein shall be construed to prohibit any municipality from exercising its police powers to regulate boxing and wrestling exhibitions held under the auspices of the above named organizations."[4]

2. William B. MacDonald, Jr. subsequently assigned to Dundee-MacDonald Enterprises, Inc. his rights and duties under the contract.

3. This section reads as follows:
   "548.01 Prize fighting, pugilistic exhibitions; penalty.—
   "Any person who shall voluntarily engage in any pugilistic exhibition, fight or encounter, with or without gloves, between man and man, or in an exhibition or fight between man and bull, or between man and any other animal, for money or anything of value, or upon the result of which any money or anything of value is to be collected, acquired, bet or wagered, or to see which any admission fee is charged, directly or indirectly, shall be punished by a fine of not less than two thousand five hundred, nor more than five thousand dollars, or by imprisonment for not more than five years."

4. This section reads as follows:
   "548.03 Pugilistic exhibition defined.—
   "By the term 'Pugilistic exhibition, encounter or fight, with or without gloves,' as used in this chapter, is meant any voluntary fight or personal encounter, by blows, between two or more persons, for money, prize of any character, points, distinction or fame, or other thing of value, or upon the results of which any money or thing of value is bet or wagered, or for which an admission fee is charged, directly or indirectly; provided, that nothing contained herein or in any law or municipal regulation shall be construed as applying to boxing exhibitions held by and under the auspices of the American legion, disabled American veterans, veterans of foreign wars of the United States, Spanish-American war veterans or companies or detachments of the Florida national guard, Y.M.C.A., junior chamber of commerce, or any college which is a member of any recognized amateur athletic association and the Circulo Cabana club, a charitable organization now in existence, whether an admission fee is charged or not; provided further, that nothing contained herein shall be construed to prohibit any municipality from exercising its

■ We remanded this case for a factual determination of "whether the fight actually was held by and under the auspices of one of the approved groups." 367 F.2d at 303. The District Court held that it was so held, finding specifically "that the municipality of Miami Beach exercised its police power in regulating this match and it was held under the auspices of the VFW Post No. 3559." We do not agree, as the evidence is overwhelming to the contrary, and the Trial Judge's ruling is clearly erroneous. Fed.R.Civ.P. Rule 52(a).

In order to circumvent the prohibitory statute against the promotion of pugilistic exhibitions, it is apparent that an arrangement was made to use the name of Veterans of Foreign Wars, Post 3559 of Miami, Florida, as sponsor of the fight. The consideration paid to the VFW for the use of their name was the nominal sum of $500 cash. Two members of VFW Post 3559 testified that approximately twenty of their members were in attendance on the night of the fight. The Secretary of the Miami Beach Boxing Commission testified that he knew that Dundee-MacDonald was the promoter of the fight but that he actually observed members of the VFW present and that their presence was necessary in order to make the boxing contest a legal venture under the laws of Florida. He also identified sample tickets for the fight on which are printed the words "Sponsored by V.F.W. Miami Beach Post No. 3559." The same witness testified that the Dundee-MacDonald Enterprises had applied for and been issued a license by the Boxing Commission to stage the championship fight.

The evidence is quite clear that the VFW had nothing whatsoever to do with holding, staging or conducting the contest and that the parties to the contract were well aware of that fact. Harold Conrad, a writer and fight promoter, who was public relations director for plaintiff, Inter-Continental, and also on-the-scene agent for Inter-Continental preliminary to the fight actually taking place, acknowledged in effect that the $500 paid to the VFW was a mere gratuity. The record discloses that he was asked, in that part of his deposition offered in evidence by defendants' counsel, as an admission against interest, the following:

"Q. Do you know what, if any, connection that organization had with this fight?

"A. Well, I think there was some kind of a handout that these guys had been having for years in this town. You can't put on a fight unless they are at the door. I don't know what the details are. I have seen them down through the years."

The Chairman of VFW Post 3559 Boxing and Wrestling Committee, Max Lenchner, testified that VFW had nothing to do with staging the fight. He said that he was told by Mr. Dundee, "We are having a fight next week, Max. Be here with the men." And Lenchner said, "That's the way it is." He further said the check for $500 was received by him, which was paid "for the use of its name in sponsorship of the fight." Then he was asked:

"Q. Now, you had nothing whatever to do with putting on this fight, did you?

"A. That's right. I have nothing to do with it whatsoever.

"Q. Neither did the Veterans of Foreign Wars?

"A. That's correct."

Benjamin Peiser, a member of the VFW Post Committee, who attended the fight and remained at the doorway in order to keep out unauthorized people, testified that the $500 check paid to the Post "was given to our organization for attending that fight." He said he had nothing to do with the taking of tickets, however, and that neither he nor the VFW in any way contributed to staging,

police powers to regulate boxing and wrestling exhibitions held under the au-

spices of the above named organizations."

holding, conducting or putting on the fight.

Frank Lewis, who was an officer and member of the board of directors of all of the MacDonald Corporations and comptroller of MacDonald, testified that VFW Post 3559 had nothing to do with holding, staging or conducting the Liston-Clay fight. He said:

"Q. And in your capacity as treasurer of the corporation you participated in the negotiation of all of the phases of holding this fight as you just described, is that correct?

"A. Yes, definitely.

"Q. What, if anything, did the Veterans of Foreign Wars, Post 3559, have to do with holding, staging or conducting the Liston-Clay fight that was held on February 25, 1964?

"A. Nothing. We used their name and paid them a contribution for that.

"Q. Do you remember how much the contribution was?

"A. Yes, $500. This was arranged for by Chris Dundee and we paid it, Dundee-MacDonald Enterprises, Inc."

Lewis also testified that "everybody was trying to get into the fight free" and so he restricted the number of people from the Veterans of Foreign Wars which had submitted a list of over thirty names to an authorization of twenty only.

Oscar Markovich, who handled the vending concessions at the Liston-Clay fight at Miami Beach, and who has been at many fights at the Convention Hall as refreshment concessionaire, also testified that the VFW Post had nothing to do with staging the fight. He said:

"Q. Were there Veterans of Foreign Wars present at the fight?

"A. Yes, there was.

"Q. Isn't it a fact that they perform no function other than being present, sir?

"A. I have never seen them perform any functions but I have seen them there.

"Q. They are just merely present?

"A. So far as I can see.

"Q. They don't take tickets?

"A. No, sir.

"Q. They don't usher people to seats?

"A. No, sir.

"Q. And they don't have anything to do with any refreshment concessions?

"A. Nothing whatsoever.

"Q. And they have nothing to do with brining [sic] [bringing] the fight to the auditorium or staging it, that you know of?

"A. No, sir."

The record further shows that MacDonald (or Dundee-MacDonald Enterprises, Inc.) performed all the necessary acts requisite to promoting and staging the fight. They leased the convention hall, worked out arrangements with crowd-control and seating engineers, employed firms to take care of publicity and advertising, contracted for the printing of tickets and programs, and actively handled every facet of promoting and conducting the fight. The conclusion is inescapable that the Liston-Clay fight was not held under the auspices of the VFW. The use of the organization's name was a mere fiction to avoid the prohibitory Florida statute, and representation on the printed tickets of VFW sponsorship was an obvious subterfuge designed to present a nominal compliance with the Florida law.

■ A second issue before us is the finding by the District Court that inasmuch as MacDonald had the obligation of conducting a lawful fight under the contract, defendants were estopped from asserting noncompliance with the exclusion clause of Florida Statutes Annotated § 548.03.

The law of Florida is to the contrary. The Supreme Court of Florida, in Montsdoca v. Highlands Bank & Trust Co., 1923, 85 Fla. 158, 95 So. 666, 668, said: "The doctrines of estoppel and waiver do not in general apply in transactions that are forbidden by statute or

that are contrary to public policy." We cited *Montsdoca* and used the quoted language with approval in Northwestern National Casualty Company v. McNulty, 5 Cir., 1962, 307 F.2d 432, 442–443. See also State ex rel. Schwartz v. City of Hialeah, Fla.App.1963, 156 So.2d 675, 676, reiterating the non-applicability of the doctrine of estoppel to transactions either forbidden by statute or contrary to public policy. The rule applies regardless of whether the party asserting the invalidity of the contract is himself a participant in the wrongdoing.[5] In Local No. 234, etc. v. Henley & Beckwith, Inc., Fla., 1953, 66 So.2d 818, 823, the Supreme Court of Florida said:

> "The cases are legion that a contract against public policy may not be made the basis of any action either in law or in equity. * * *

> "Agreements in violation of public policy are void because they have no legal sanction and establish no legitimate bond between the parties. Brumby v. City of Clearwater, supra [108 Fla. 633, 149 So. 203]. *Because of this the defendant may assert the invalidity of the contract even though he is a participator in the wrong.* This is so for the reason that one who has entered into a contract or undertaking which is violative of public policy owes to the public the continuing duty of withdrawing from such an agreement." (Emphasis supplied.)

It has also been said that illegality of a contract as a defense is allowed not to protect the defendant but as a disability to the plaintiff. National Transformer Corp. v. France Mfg. Co., 6 Cir., 1954, 215 F.2d 343, 361; Roberts v. Criss, 2 Cir., 1920, 266 F. 296. The evidence shows that the parties, pursuant to their contract, accomplished an unlawful purpose by virtue of an apparent subterfuge. Under the circumstances, the law will leave the parties where it finds

them, and no relief shall be granted because of the dominant public interest. See National Transformer Corp. v. France Mfg. Co., supra, 215 F.2d at 361. Cf. Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 357, 51 S.Ct. 476, 477, 75 L.Ed. 1112; Steele v. Drummond, 275 U.S. 199, 207, 48 S.Ct. 53, 55, 72 L.Ed. 238 (1927).

Reversed.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is Denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.

---

5. See also Citizens' Bank & Trust Co. v. Mabry, 1931, 102 Fla. 1084, 136 So. 714, 717; Robert G. Lassiter & Co. v. Taylor, 1930, 99 Fla. 819, 128 So. 14, 19; LeJohn Manufacturing Company v. Webb, 1955, 95 U.S.App.D.C. 358, 222 F.2d 48, 52; National Transformer Corp. v. France Mfg. Co., 6 Cir., 1954, 215 F.2d 343, 361; Standard Lumber Co. v. Butler Ice Co., 3 Cir., 1906, 146 F. 359, 362.